**15-15579-F**

IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

———— ◆ ◆ ————

MANUEL CHRISTIANSEN and BRIAN ASHTON,

*Relator-Appellants,*

—v.—

EVERGLADES COLLEGE, INC., d.b.a. KEISER UNIVERSITY,

*Defendant-Appellee,*

—and—

UNITED STATES OF AMERICA,

*Intervenor Plaintiff-Appellee.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 0:12-CV-60185-WPD

---

## INITIAL BRIEF OF RELATOR-APPELLANTS
## MANUEL CHRISTIANSEN AND BRIAN ASHTON

---

DAVID A. KOENIGSBERG, ESQ.
MENZ BONNER KOMAR
  & KOENIGSBERG LLP
444 Madison Avenue, 39th Floor
New York, New York 10022
(212) 223-2100

IRA B. SILVERSTEIN, ESQ.
THE SILVERSTEIN FIRM, LLC
1515 Market Street, Suite 1200
Philadelphia, Pennsylvania 19102
(215) 854-4068

DALE JAMES MORGADO, ESQ.
MORGADO PA
600 Third Avenue, 2nd Floor
New York, New York 10016
(212) 991-8431

*Attorneys for Relator-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rule 26.1-1, appellants certify that the following named persons are parties interested in the outcome of this case:

1.  Brian Ashton, Relator-Appellant.

2.  Manuel Christiansen, Relator-Appellant.

3.  Ira B. Silverstein, Counsel for the Appellants.

4.  The Silverstein Firm, LLC, Counsel for the Appellants.

5.  Dale J. Morgado, Counsel for the Appellants.

6.  Morgado, P.A., Counsel for the Appellants.

7.  David A. Koenigsberg, Counsel for the Appellants.

8.  Menz Bonner Komar & Koenigsberg LLP, Counsel for the Appellants.

9.  Everglades College, Inc. d/b/a Keiser University, Defendant-Appellee.

10.  Scott Cole, Counsel for the Appellee.

11.  Cole, Scott, & Kissane, P.A., Counsel for the Appellee.

12. Barry Postman, Counsel for the Appellee.

13. Thomas E. Scott, Counsel for the Appellee.

14. Justin Sorel, Counsel for the Appellee.

15. Daniel Swartz, Counsel for the Appellee.

16. United States of America, Plaintiff-Appellee.

17. James Weinkle, AUSA, Counsel for Plaintiff-Appellee.

18. Allison Cendali, DOJ, Counsel for Plaintiff-Appellee.

19. Jeffrey Clair, DOJ, Counsel for Plaintiff-Appellee.

20. Hon. William P. Dimitrealous, U.S. District Judge, U.S. District Court for the Southern District of Florida, (Presiding judge below).

21. Hon. Lurana Snow, U.S. Magistrate Judge, U.S. District Court for the Southern District of Florida, (Magistrate below).

22. State of Florida, Plaintiff.

## CORPORATE DISCLOSURE STATEMENT

Not Applicable to the Relators/Appellants/Cross-Appellees.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument. The case raises a number of questions of first impression concerning the interpretation of the False Claims Act ("FCA"). Government intervention to impose a settlement after trial and during appeal, at issue here, is unprecedented and will have serious consequences on the willingness of relators and their counsel to pursue FCA cases. In addition, the district court's decision after trial, which in large part rejected the positions espoused by the United States in its Statements of Interest filed below, has serious policy implications that may impact the continued vitality of the FCA as a means of combatting fraud in the context of Title IV of the Higher Education Assistance Act.

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTERESTED PERSONS............................ C-1

CORPORATE DISCLOSURE STATEMENT............................ C-2

STATEMENT REGARDING ORAL ARGUMENT ...................... i

TABLE OF CITATIONS.................................................. vi

I.     PRELIMINARY STATEMENT ...................................... 1

II.    STATEMENT OF JURISDICTION.................................. 2

       DISTRICT COURT JURISDICTION................................ 2

       COURT OF APPEALS JURISDICTION............................ 2

III.   STATEMENT OF THE ISSUES .................................... 4

IV.   STATEMENT OF THE CASE........................................ 6

       A.  Nature of the Case and Factual Background...................... 6

       B.  Procedural History ................................................ 10

       C.  Standard of Review ................................................ 13

V.     SUMMARY OF ARGUMENT........................................ 15

       A.  The Settlement Was Neither Fair, Adequate or
           Reasonable Under the Circumstances ............................ 15

       B.  The District Court's Approval of the Settlement Was
           Tainted by Its Trial Ruling. ...................................... 16

       C.  The District Court's Prior Decision On the Merits
           Was Incorrect...................................................... 16

       D.  The Government's Intervention Was Not for Good Cause
           nor Did It Satisfy Fed. R. Civ. P. 24............................ 17

PAGE

E.  Relators Were Entitled to Discovery and an Evidentiary
    Hearing................................................................. 17

VI.  ARGUMENT ........................................................... 18

  A.  The Settlement Was Neither Fair, Adequate or Reasonable
     Under the Circumstances ........................................... 18

    1.  Background and Introduction................................. 18

    2.  The "Fair, Adequate and Reasonable" Standard............. 19

       a)  Relators have a significant likelihood of success
          on appeal................................................... 21

          (1) The definition of false claims ........................ 23

          (2) The Government's failure to intervene and failure
              to pursue administrative remedies ................... 25

          (3) The standard the district court used in refusing to
              impute knowledge to Keiser ......................... 29

          (4) The district court's speculation concerning possible
              damage offsets and its failure to treble damages
              before giving Keiser credit for these offsets ........ 30

       b)  The range of possible recovery ........................... 34

       c)  The point on or below the range of possible recovery at
         which a settlement is fair, adequate and reasonable .... 35

       d)  The complexity, expense and duration of litigation .... 36

       e)  The substance and amount of opposition to the
         settlement ................................................... 37

       f)  The stage of proceedings at which the settlement was
         achieved..................................................... 37

PAGE

g)  There is substantial reason to believe the Settlement
was not reached in good faith.............................  38

B.  The District Court's Approval of the Settlement Was Tainted
by Its Trial Ruling.................................................  39

C.  The District Court's Prior Decision On the Merits Was
Incorrect.........................................................  41

1.  The Measure of Damages Used ...............................  42

2.  The Burden of Proof Regarding Offsets......................  43

3.  Numerous Aspects of the District Court's Findings Are
Not Supported by The Record...............................  44

a)  The district court's finding that Keiser only submitted
two claims.................................................  44

b)  The finding Keiser's "top policymakers" lacked
knowledge of the violations prior to
November 2009.............................................  44

(1) The exclusive focus on gift cards and
token days.................................................  45

(2) The finding the practices were limited to two
campuses.................................................  46

(3) The finding the practices violated Keiser
policy.....................................................  47

(4) The November 2009 investigation and the finding
Keiser stopped the violations..........................  48

(5) The finding there was no deliberate ignorance or
reckless disregard for the truth.......................  51

c)  The calculation of damages was clearly erroneous....  52

iv

PAGE

D.  The Government's Intervention Was Not for Good Cause nor Did It Satisfy Fed. R. Civ. P. 24 ............................ 53

  1.  Applicable Legal Context and Standards ................... 53

  2.  The Motion to Intervene Was Not Timely ................. 55

  3.  The Intervention Has Unduly Delayed and May Prejudice the Adjudication of the Original Parties' Rights ........... 57

  4.  The Government Has Not Demonstrated Good Cause ..... 57

E.  Relators Were Entitled to Discovery and an Evidentiary Hearing ............................................................ 60

VII. CONCLUSION ....................................................... 67

CERTIFICATE OF COMPLIANCE...................................... 68

CERTIFICATE OF SERVICE ............................................ 69

# TABLE OF CITATIONS

PAGE(S)

## Cases

*United States ex rel. Atkins v. McInteer*,
  470 F.3d 1350 (11th Cir. 2006) .......................................... 25

*United States ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*,
  2011 U.S. Dist. LEXIS 109859 (M.D. Fla. Sept. 27, 2011) ......... 54

*Bennett v. Behring Corp.*,
  737 F.2d 982 (11th Cir. 1984)......................................... 21, 61

*Brown v. Advantage Eng'g, Inc.*,
  960 F.2d 1013 (11th Cir. 1992) ......................................... 55

*United States ex rel. Chandler v. Cook County, Ill.*,
  277 F.3d 969 (7th Cir. 2002), *aff'd*, 538 U.S. 119,
  123 S. Ct. 1239 (2003) .................................................. 25

*Day v. Persels & Assocs., LLC*,
  729 F.3d 1309 (11th Cir. 2013) ......................................... 20

*In re Domestic Air Transp. Antitrust Litig.*,
  148 F.R.D. 297 (N.D. Ga. 1993) ...................................... 21, 36

*FDIC v. Oldenberg*,
  38 F.3d 1119 (10th Cir. 1994)......................................... 43

*United States ex rel. Feldman v. van Gorp*,
  697 F.3d 78 (2d Cir. 2012) ........................................... 25, 40

*Gevaerts v. TD Bank, N.A.*,
  2015 U.S. Dist. LEXIS 150354 (S.D. Fla. Nov. 5, 2015)........... 35, 36

*Grand Union Co. v. United States*,
  696 F.2d 888 (11th Cir. 1983)..................................... 29, 30, 40

*United States ex rel. Keeler v. Eisai, Inc.*,
  Case. No. 13-109730 (11th Cir. June 11, 2014) ..................... 25

*Knight v. Alabama*,
  469 F. Supp. 2d 1016 (N.D. Ala. 2006) ............................... 21

PAGE(S)

*United States ex rel. Lam v. Tenet Healthcare Corp.*,
  481 F. Supp. 2d 689 (W.D. Tex. 2007)............................... 54, 58

*United States ex rel. Man Tai Lam v. Man Tai Lam*,
  287 Fed. Appx. 396 (5th Cir. Tex. 2008)............................. 58

*United States ex rel. Matheny v. Medco Health Solutions, Inc.*,
  671 F.3d 1217 (11th Cir. 2012) ...................................... 42

*United States ex rel. McCoy v. California Medical Review, Inc.*,
  133 F.R.D. 143 (N.D. Cal. 1990) ..................................... 60

*United States ex rel. McNutt v. Haleyville Medical Supplies, Inc.*,
  423 F.3d 1256 (11th Cir. 2005) ...................................... 23, 25

*U.S. ex rel. Nudelman v. Int'l Rehab. Associates, Inc.*,
  2004 U.S. Dist. LEXIS 8951,
  2004 WL 1091032 (E.D. Pa. May 14, 2004)......................... 20, 62

*United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist.*,
  688 F.3d 410 (8th Cir. 2012) ......................................... 26, 29

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
  116 F. Supp.3d 1326 (S.D. Fla. 2015) ................................ 24

*Protective Committee for Indep. Stockholders
  of TMT Trailer Ferry v. Anderson*,
  390 U.S. 414, 88 S. Ct. 1157 (1968)............................ 40, 64, 65

*U.S. ex rel. Resnick v. Weill Med. Coll. of Cornell Univ.*,
  2009 U.S. Dist. LEXIS 24376,
  2009 WL 637137 (S.D.N.Y. Mar. 5, 2009) ......................... 20, 61

*United States ex rel. Reynolds v. General Electric Co.*,
  2007 WL 3020464
  (D.S.C. Oct. 11, 2007) ............................................... 58, 59

*Ridenour v. Keiser-Hill Co., LLC*,
  397 F.3d 925 (10th Cir. 2005)....................................... 62

*United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*,
  2015 U.S. Dist. LEXIS 156924 (N.D. Ga. Oct. 30, 2015)........... 24

PAGE(S)

*United States ex rel. Schweizer v. Océ N. Am., Inc.*,
 956 F. Supp. 2d 1 (D.D.C. 2013).................................. 20, 61, 62

*U.S. ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*,
 151 F.3d 1139 (9th Cir. 1998)..........................................  62

*\*Stallworth v. Monsanto Co.*,
 558 F.2d 257 (5th Cir. 1977) .......................................... 56, 57

*Sterling v. Stewart*,
 158 F.3d 1199 (11th Cir. 1998) .......................................  35

*United States ex rel. Ubl v. IIF Data Solutions*,
 650 F.3d 445 (4th Cir. 2011) ..........................................  25

*United States v. Aging Care Home Health, Inc.*,
 2006 U.S. Dist. LEXIS 73047 (W.D. La. 2006) ......................  43

*United States v. Alabama*,
 271 Fed. Appx. 896 (11th Cir. 2008) .................................  39

*United States v. Aseracare, Inc.*,
 2012 U.S. Dist. LEXIS 152591 (N.D. Ala. Oct. 24, 2012) ..........  54

*\*United States v. Bornstein*,
 423 U.S. 303, 96 S. Ct. 523 (1976) .................. 25, 30, 31, 32, 40, 43

*United States v. General Dynamics Corp.*,
 19 F.3d 770 (2d Cir. 1994) ............................................  26

*United States v. Globe Remodeling Co.*,
 196 F. Supp. 652 (D. Vt. 1960) ......................................  31

*\*United States v. Killough*,
 848 F.2d 1523 (11th Cir. 1988) .................................. 23, 25, 40

*United States v. NEC Corp.*,
 11 F.3d 136 (11th Cir.1993)...........................................  54

*United States v. Ritchie Special Credit Invs., Ltd.*,
 620 F.3d 824 (8th Cir. 2010) ..........................................  55

*United States v. Sanford-Brown, Ltd.*,
 30 F. Supp. 3d 806, 811-12 (E.D. Wis. 2014) .......................  65

PAGE(S)

*United States v. Sanford-Brown, Ltd.*,
  788 F.3d 696 (7th Cir. 2015) ......................................... 65, 66

\*United States v. Science Applications Int'l Corp.*,
  626 F.3d 1257 (D.C. Cir. 2010) .......................................  40

*United States v. United States Gypsum Co.*,
  333 U.S. 364, 68 S. Ct. 525 (1948) ..................................  53

*Universal Health Servs. v. United States ex rel. Escobar*,
  2015 U.S. LEXIS 7677, 193 L. Ed. 2d 465,
  84 U.S.L.W. 3320 (U.S. Dec. 4, 2015) ..............................  23

\*Urquilla-Diaz et al. v. Kaplan Univ. et al.*,
  780 F.3d 1039 (11th Cir. 2015) ......................................  23

## Statutes, Rules and Regulations

34 C.F.R. § 668.14(22)(i) ..............................................  8

34 C.F.R. § 668.162 ....................................................  44

20 U.S.C. § 1070 *et seq.*
  (Title IV of the Higher Education Assistance Act)...................  2

20 U.S.C. § 1094(a)(20) ................................................  8

28 U.S.C. § 1291 ......................................................  2

31 U.S.C. § 3729 *et seq.* (False Claims Act) ........................ 2, 26

31 U.S.C. § 3730(b).....................................................  28

31 U.S.C. § 3730(c).....................................................  28

31 U.S.C. § 3730(c)(2)(B)........................................... 20, 60, 64

31 U.S.C. § 3730(c)(3) ................................................ 4, 53

31 U.S.C. § 3730(c)(5) .................................................  28

31 U.S.C. § 3732 ......................................................  2

Fed. R. Civ. P. 23(e)(2)................................................  20

Fed. R. Civ. P. 24 ................................................ 17, 53, 54

PAGE(S)

Fed. R. Civ. P. 24(b) ..................................................... 4

Fed. R. Civ. P. 24(b)(3) .................................................. 55

Fed. R. Civ. P. 41(a)(2) ............................................... 3, 13

**Other Authorities**

6-24 Moore's Federal Practice - Civil § 24.21 .......................... 55

S. Rep. No. 99-345 (1986) ........................................... 27, 28

S. Rep. No. 96-615 (1980) .............................................. 33

x

## I.     PRELIMINARY STATEMENT

References to the record will be designated by the letter "R" followed by the district court ECF number, followed by the page number.  For example, the first page of the complaint will be referenced as R.1 at 1.  When references are to trial exhibits, the reference will be supplemented by the exhibit number.

## II.    STATEMENT OF JURISDICTION

**DISTRICT COURT JURISDICTION**

This case began as a private *qui tam* action brought by Appellants pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA"). Appellants ("Relators") alleged the defendant/appellee Everglades College d/b/a Keiser University ("Keiser") submitted false claims for federal funds under Title IV of the Higher Education Assistance Act, 20 U.S.C. § 1070 *et seq*. ("Title IV").[1] The district court had subject matter jurisdiction pursuant to 31 U.S.C. § 3732. The United States of America ("the U.S." or "the Government") intervened after trial, during the pendency of an appeal.

**COURT OF APPEALS JURISDICTION**

Relators appeal from a final order entered on November 12, 2015 approving a settlement negotiated by the U.S. and Keiser. R.465. The order disposed of all parties' claims with the exception of Relators' petitions for awards of costs, attorney fees and expenses. The notice of appeal was timely filed on December 14, 2015 (R.468).  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

---

[1] R.1 at 22-26.

2

On December 10, 2015, the approved settlement having been executed, the U.S. moved to formally dismiss the complaint with prejudice pursuant to Fed. R. Civ. P. 41(a)(2). R.467. Relators opposed the motion to forestall any claim of waiver. R.471. All parties agreed the district court retained jurisdiction to rule on the motion to dismiss, as it simply executed the prior order approving the settlement. R.471, 474 and 475. The court granted the motion on January 8, 2016, R.476, and Relators have filed a notice of appeal from this order as a matter of procedural caution.

### III.    STATEMENT OF THE ISSUES

1.    Was the Government's $335,000 post-appeal settlement ("the Settlement") of an FCA case previously prosecuted solely by Relators "fair, adequate and reasonable under all the circumstances?"

2.    Was the district court's approval of the Settlement facially inadequate because of its unquestioning reliance on its own fundamentally flawed prior ruling that the Government had not suffered any damages and only a *de minimus* penalty of $11,000 should be imposed?

3.    Was the district court's prior decision on the merits wrong as a matter of law and did it contain clearly erroneous findings of fact? Subsumed within this issue are issues raised in the prior appeal, 14-139992-D, which was short-circuited by the Settlement.

4.    Did the Government's intervention satisfy the permissive intervention standards of Fed. R. Civ. P. 24(b) and the "good cause" requirement of 31 U.S.C. § 3730(c)(3)?

     5.     Were Relators entitled to limited discovery and an evidentiary hearing before the district court ruled on Keiser's and the Government's motion to approve the Settlement?

# IV.   STATEMENT OF THE CASE

## A. Nature of the Case and Factual Background

Relators instituted this *qui tam* litigation against Keiser pursuant to the FCA's procedures for private actions on behalf of the U.S. Keiser is a private educational institution operating at 14 physical campuses, predominantly located in Florida, and through an online division.  R.348 at 119:17-19.  Its revenues during the time period relevant to this case, 2007-2013, averaged approximately $300 million per annum.[2]  Roughly 80% of these revenues, $1,288,162,457.97, came from the Government in the form of student loans and grants issued under Title IV. R.317 at 3 ¶ 3-4, R.359-19 (P-149).

During this time, Keiser functioned first as a for-profit institution (2007-2011) and then as a nominal non-profit entity.  Whether in the guise of a for-profit or non-profit corporation, approximately $50 million a year of the $300 million in annual revenues has been funneled to the Keiser family, the institution's *de jure* owners before the conversion to non-profit status and its *de facto* owners since.[3]

---

[2] R.360-13, at 4; R.360-21, at 4; R.360-22, at 4; R.360-23, at 4; R.360-24, at 4; R.360-25, at 4; R.360-26, at 4.

[3] Numerous mechanisms divert Keiser's revenues to the Keiser family.  The details can be gleaned from the "related party transaction" sections of its

Relators are former Keiser employees who worked in the Keiser Admissions Department.  The department's function is to recruit and enroll students.  R.348 at 119:17-19.  Admissions personnel, titled Admissions Counselors, spend most of their time on the phone, making cold-calls, following up on third-party generated leads and trying to convince prospects to come in for an interview.  R.348 at 121-122; R.350 at 504-505.  Each counselor is expected to make between 50 and 100 such calls a day, and speak to 100 different people a week at minimum. R.348 at 125, R.348 at 307.  As there are over 100 admissions counselors working for Keiser at any one time, R.348 at 120-121, some 7,000 calls are expected to be made a day or about 2 million calls a year. At issue in this case are various practices Keiser engaged in and, to some extent, still engages in to keep its admissions counselors incentivized.  R.350 at 618-620.

---

financial statements. R.360-20 (D-20) at 9-10; R.360-21 (D-21) at 10; R.360-22 (D-22) at 10-11; R.360-23 (D-23) at 9-10; R.360-24 (D-24) at 9-10; R.360-25 (D-25) at 9-12; R.360-26 (D-26) at 10-12, 15.  To summarize, Dr. Keiser is owed $300,000,000 by Everglades. This sum represents the seller financing of the transition to non-profit status which was effected by having Everglades, an assetless, non-profit shell, "purchase" the for-profit Keiser University from the Keiser family in exchange for a $300,000,000 note to be paid to the Keisers out of future surplus, i.e. profits.  In addition, Dr. Keiser owns virtually all of the real estate used by the school, is paid substantial triple-net rents, and owns the affiliate management company to whom Keiser pays a yearly management fee.  R.350 at 612-614.

Title IV places explicit limitations on the types of incentives that can

be offered to admissions personnel.  These limitations are known as the

Incentive Compensation Ban ("ICB"). 20 U.S.C. § 1094(a)(20); 34 C.F.R. §

668.14(22)(i). To be eligible for Title IV funding, an educational institution

must annually certify compliance with the ICB. 20 U.S.C. § 1094(a)(20).

The ICB provides:

> a) . . . In order to be an eligible institution . . ., an
> institution . . . [shall] enter into a program participation
> agreement with the Secretary. The agreement shall
> condition the initial and continuing eligibility of an
> institution to participate in a program upon compliance
> with the following requirements:
>
> . . .
>
> (20) The institution will not provide any
> commission, bonus, or other incentive payment based
> directly or indirectly on success in securing enrollments
> or financial aid to any persons or entities engaged in any
> student recruiting or admission activities or in making
> decisions regarding the award of student financial
> assistance . . ..

20 U.S.C. § 1094(a)(20).

Relators, while employed at Keiser, became aware of practices that

violated the ICB.  These practices involved incentives for meeting

enrollment targets or winning enrollment "contests." Incentives took the

form of gift cards with cash value,[4] cruises,[5] "token days" (half days off with pay),[6] individual and team meals,[7] and other assorted benefits.[8] Relators alleged Keiser's express and implied certifications that it was not violating the ICB gave rise to treble damages and civil penalties under the FCA.

_____

[4] R.356-5 (P-14); R.356-13 (P-22); R.356-20 (P-29); R.356-21 (P-30); R.356-22 (P-31); R.356-23 (P-32); R.356-24 (P-33); R.356-26 (P-35); R.356-27 (P-36); R.356-35 (P-44); R.356-36 (P-45); R.357-3 (P-53); R.357-16 (P-66); R.358-4 (P-84); R.358-6 (P-86); R.358-22 (P-102); R.358-36 (P-116); R.358-39 (P-119); R.358-43 (P-123); R.359-5 (P-135); R.359-6 (P-136); R.359-10 (P-140); R.359-11 (P-141); R.359-12 (P-142); R.359-13 (P-143); R.359-28 (P-158); R.359-37 (P-168)

[5] R.356-14 (P-23); R.356-15 (P-24); R.356-16 (P-25); R.356-17 (P-26); R.356-19 (P-28); R.356-37 (P-46); R.357-14 (P-64); R.358-15 (P-95).

[6] R.356-4 (P-13); R.356-6 (P-15); R.356-7 (P-16); R.356-8 (P-17); R.356-9 (P-18); R.356-10 (P-19); R.358-24 (P-104); R.358-25 (P-105); R.358-26 (P-106); R.358-27 (P-107); R.358-28 (P-108); R.358-29 (P-109); R.358-30 (P-110); R.358-31 (P-111); R.358-32 (P-112); R.358-33 (P-113); R.358-36 (P-116); R.358-37 (P-117); R.358-38 (P-118); R.358-40 (P-120).

[7] R.356-9 (P-18); R.356-18 (P-27); R.356-28 (P-37); R.356-29 (P-38); R.356-30 (P-39); R.357-4 (P-54); R.357-6 (P-56); R.357-7 (P-57); R.357-8 (P-58); R.357-9 (P-59); R.357-10 (P-60); R.357-11 (P-61); R.357-12 (P-62); R.357-13 (P-63); R.357-17 (P-67); R.357-18 (P-68); R.358-5 (P-85); R.358-7 (P-87); R.358-34 (P-114); R.358-35 (P-115); R.358-36 (P-116); R.358-44 (P-124); R.358-45 (P-125); R.358-46 (P-126); R.358-47 (P-127); R.358-48 (P-128); R.358-49 (P-129); R.358-50 (P-130; R.359-1 (P-131); R.359-2 (P-132); R.359-3 (P-133); R.356-9 (P-18); R.356-31 (P-40); R.356-32 (P-41); R.357-2 (P-52); R.357-5 (P-55); R.358-23 (P-103); R.358-27 (P-107); R.358-36 (P-116); R.358-40 (P-120).

[8] R.356-18 (P-27); R.356-28 (P-37); R.356-30 (P-39); R.357-6 (P-56); R.357-7 (P-57); R.358-7 (P-87).

9

## B. Procedural History

Relators' complaint was filed under seal on February 1, 2012. R.1. The U.S. declined to intervene; but during the course of the case it filed three Statements of Interest in support of Relators. R.22, R.152, and R.317. These Statements of Interest supported Relators' positions concerning: (i) the FCA's knowledge element,[9] (ii) the definition of claims,[10] (iii) materiality,[11] (iv) causation,[12] and (v) the measure of damages.[13]

After a four-day bench trial, the district court found that Keiser engaged in all the challenged incentive practices and that those practices violated the ICB. R.318 at 6 ¶ 10-¶ 11, 7 n.4. However, the court also held: (i) Keiser only briefly possessed the requisite knowledge for FCA liability, despite high-level management's involvement in the practices during each year in question, R.318 at 8 ¶ 17, (ii) only two false claims, i.e. annual certifications of compliance, were made —the court did not consider the

---

[9] R.152 at 7-8; R.317 at 4-5.

[10] R.22 at 5; R.152 at 9; R.317 at 5-7.

[11] R.152 at 4-6; R.317 at 3-4.

[12] R.22 at 5; R.152 at 11-12.

[13] R.152 at 8-12.

thousands of separate requests for Government funds to be false claims, R.318 at 8 ¶ 17, 13 ¶ 33, and (iii) the Government did not sustain any damages. R.318 at 18 ¶ 44, 20 ¶ 50-¶ 55. In finding the U.S. had not been damaged, the district court relied primarily on the fact the U.S. had not intervened or pursued any administrative remedies. The court further speculated that students might have attended other colleges if they had not been recruited to Keiser and that potential future profits from student loan repayments might make up for out-and-out federal grants that would never be recovered. It then assessed the minimum penalty allowable under the FCA, $5,500 per false claim, for a total of $11,000. R.318 at 22.

Relators appealed, 14-13992-D, and the U.S. informed them the Government was likely to file an *amicus* brief; however, after Relators had filed their initial brief and a 13-volume appendix, the U.S. negotiated a settlement with Keiser in the amount of $335,000, a miniscule fraction of Keiser's exposure on appeal. It was negotiated without Relators' knowledge.

Relators refused to consent to the settlement, and the U.S. and Keiser then filed a motion asking the district court to indicate whether it would grant Government motions to intervene and approve the settlement. R.430.

The district court indicated it would grant the motions, R.435, and this Court then remanded and dismissed the prior appeal.[14]

After remand, the U.S. filed a combined motion to (i) intervene, (ii) approve the settlement and (iii) for a protective order barring any discovery by Relators into the negotiation of and the reasons for the Settlement. R.438. The district court first ruled on the request for a protective order and the motion to intervene, adopting a magistrate's report and recommendation that no discovery be permitted and independently granting intervention. R.462 and 463. It also scheduled a fairness hearing on the motion to settle but noted it would not be an evidentiary hearing. R.462 and 463. The fairness hearing was held on November 4, 2015.  When it concluded, the district court issued an instantaneous unexplained ruling from the bench approving the settlement and asked the U.S. to submit a proposed form of order. R.464. The proposed order was subsequently entered as an order of the court on November 12, 2015. R.465. This appeal followed. R.468.

---

[14] On a parallel track, Relators moved for an award of attorney's fees, costs and expenses. The district court's ruling on this motion was also appealed and this Court vacated and remanded so that the district court could reconsider the attorneys fee award after it had ruled on the motion to settle. Appeal No. 15-10711.

Subsequently, the Government moved for dismissal with prejudice under Fed. R. Civ. P. 41(a)(2). R.467. Relators opposed the motion for the purpose of forestalling claims of waiver. R.471. On January 7, 2016, the district court granted the motion to dismiss. R.476. A second protective appeal followed.

**C. Standard of Review**

1.    The district court's rulings on the meaning of statutory terms is subject to *de novo* review.

2.    Whether the district court used the appropriate standards in approving the Settlement is subject to *de novo* review. Whether the district court weighed the standards properly is reviewed for abuse of discretion.

3.    The conclusions of law in the district court's trial ruling are subject to *de novo* review.  Its findings of fact should not be set aside unless clearly erroneous.

4.    Whether the district court used the appropriate standards in granting the Government's motion to intervene is subject to *de novo* review. Whether the district court weighed the standards properly is reviewed for abuse of discretion.

5.    Whether the district court used the appropriate standards in denying Relators discovery or an evidentiary hearing in connection with the motion to approve the Settlement is subject to *de novo* review. Whether the district court weighed the standards properly is reviewed for abuse of discretion.

## V.    SUMMARY OF ARGUMENT

### A. The Settlement Was Neither Fair, Adequate or Reasonable Under the Circumstances.

If FCA relators oppose a proposed settlement, the courts must determine if the settlement is fair, adequate and reasonable. This standard is analogous to the standards used to evaluate settlements of class actions. The district court failed to conduct such an analysis. Instead, without explanation, it simply declared the settlement met any required standards. If the proper analysis is conducted, it becomes apparent the settlement was woefully inadequate as (1) Relators had a substantial likelihood of success on appeal; the district court's trial ruling was replete with crucial, determinative and obvious errors of law, unsupported findings of fact and unjustified speculation, (2) the potential recovery was in the hundreds of millions if not billions of dollars but the Settlement was only for $335,000, (3) the case had proceeded through trial and the beginning phases of appeal, leaving minimal additional time and expense to be invested to see the case through, and (4) the Government settled the case without having engaged in any meaningful due diligence.

15

**B. The District Court's Approval of the Settlement Was Tainted by Its Trial Ruling.**

The district court's sole articulated reason for approving the Settlement was that it far exceeded the amount the court had awarded after trial. The district court never considered why Keiser, after reviewing Relators' appellate brief, would agree to pay an amount 30 times greater than the judgment the court had entered. The proposed settlement should have led the court to reexamine its Trial Ruling and to evaluate Relator's appellate brief, which had been appended to Relators' opposition to the Settlement.

**C. The District Court's Prior Decision On the Merits Was Incorrect.**

The Trial Ruling itself ignored binding case law, unrefuted documentary evidence and admissions.  Instead, it engaged in unsupportable speculation and set forth insurmountable and unprecedented burdens concerning the measure of damages. The net effect turned the FCA into a mechanism through which for-profit colleges can pay an annual $5,500 license fee for the right to plunder the federal fisc.

16

**D. The Government's Intervention Was Not for Good Cause nor Did It Satisfy Fed. R. Civ. P. 24.**

It is unprecedented for the Government to intervene in an FCA case for the purpose of imposing a settlement on relators after the case was prosecuted through trial and the initial stages of appeal by relators alone. The U.S. has yet to offer any justification for sandbagging the Relators in this manner beyond meaningless platitudes. Its rationales are clearly pretextual and raise the specter of improper purpose.

**E. Relators Were Entitled to Discovery and an Evidentiary Hearing.**

Relators were denied the right to meaningfully explore the real reasons for the Settlement or to explore the process by which the Settlement was reached. The required pre-approval hearing was a *pro-forma*, substanceless exercise. The district court simply rubber-stamped its prior indicative ruling.

17

## VI.    ARGUMENT

**A. The Settlement Was Neither Fair, Adequate or Reasonable Under the Circumstances.**

    1.   <u>Background and Introduction</u>.

On January 14, 2015, almost three-years after Relators had initiated this FCA case against Keiser; over two years after the Government decided not to intervene as a matter of right, R.15; after more than two years of bitterly contentious litigation during which Relators dealt, unaided, with extensive motion practice, discovery, and expensive scouring of electronically stored information; six months after a four-day bench trial which resulted in a finding of liability against Keiser; four months after Relators appealed; and a month after Relators filed an initial appellate brief and a 13-volume appendix, the U.S. entered into a settlement with Keiser behind Relators' backs. The Government negotiated the Settlement without awaiting Keiser's appellate brief, without bothering to read Relators' appellate brief or the trial transcript and without notice to or consultation with the Relators. Relators were not even aware a settlement was being considered. Rather, they had been informed the Government was awaiting the filing of all the appellate briefs before deciding whether to file an *amicus* brief. Relators had even been advised the Civil Division of the Department of Justice was likely to

recommend the filing of an *amicus* brief supporting Relators' legal positions.
R.432-4 through R.432-13.

Post-trial, post-appeal Government intervention for the purpose of imposing
a settlement upon FCA relators is unprecedented.  But the Government has not
sought to justify this unprecedented action with unprecedented circumstances.
Rather, the only reasons the Government has articulated is its wish to resolve the
uncertainty of an appeal and a desire to conserve resources. R.430 at 10-11.  Such
a rationale can be proffered in any case at any time.

No rational has ever been offered for settling this particular case on the
particular terms negotiated; no analysis provided explaining why the issues raised
in the aborted appeal – issues the Government has frequently litigated in other
jurisdictions – should not be pursued here; no articulation of why the U.S. has gone
to unprecedented lengths to prevent review of the district court's flawed Findings
of Fact and Conclusions of Law ("the Trial Ruling") - a ruling that ignores long
established principles of FCA jurisprudence and engages in speculative flights to
avoid awarding damages.

2.    The "Fair, Adequate and Reasonable" Standard.

When the Government proposes to settle an FCA claim initiated by relators,
it bears a burden of justifying the proposed settlement.

19

> The Government may settle the action with the defendant
> notwithstanding the objections of the person initiating the
> action if the court determines, after a hearing, that the proposed
> settlement is fair, adequate, and reasonable under all the
> circumstances.

31 U.S.C. § 3730(c)(2)(B).

Most courts applying this statutory standard have turned to the jurisprudence applicable to settlements of class actions, reasoning that since the language of the FCA is borrowed from Fed. R. Civ. P. 23(e)(2), the rule which governs class action settlements, Congress intended the standards be similar. *United States ex rel. Schweizer v. Océ N. Am., Inc.*, 956 F. Supp. 2d 1, 10-11 (D.D.C. 2013); *U.S. ex rel. Nudelman v. Int'l Rehab. Associates, Inc.*, 00-cv-1837, 2004 U.S. Dist. LEXIS 8951, 2004 WL 1091032, at *1 n.1 (E.D. Pa. May 14, 2004); *U.S. ex rel. Resnick v. Weill Med. Coll. of Cornell Univ.*, 04-cv-3088, 2009 U.S. Dist. LEXIS 24376, 2009 WL 637137, at *2 (S.D.N.Y. Mar. 5, 2009).

This Circuit uses six factors to determine if settlements are "fair, adequate and reasonable:"

> (1) the likelihood of success at trial; (2) the range of possible
> recovery; (3) the point on or below the range of possible
> recovery at which a settlement is fair, adequate and reasonable;
> (4) the complexity, expense and duration of litigation; (5) the
> substance and amount of opposition to the settlement; and (6)
> the stage of proceedings at which the settlement was achieved.

*Day v. Persels & Assocs., LLC*, 729 F.3d 1309, 1326 (11th Cir. 2013).

20

In addition, the reviewing court should "determine[] that the settlement has been achieved in good faith through arms-length negotiations and is not the product of collusion between the parties and/or their attorneys." *Bennett v. Behring Corp.*, 737 F.2d 982, 987 (11th Cir. 1984). "The burden of establishing the fairness, adequacy, and reasonableness of the proposed Settlement Agreements rests on the settlement proponents. *Domestic Air*, 148 F.R.D. at 312." *Knight v. Alabama*, 469 F. Supp. 2d 1016, 1032 (N.D. Ala. 2006).

        a)    <u>Relators have a significant likelihood of success on appeal</u>.

The likelihood of success is "[b]y far the most important factor in evaluating the fairness and adequacy of a settlement." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 314-315 (N.D. Ga. 1993) (Citing *Armstrong v. Board of School Directors*, 616 F.2d 305, 314 (7th Cir. 1980); *Grunin v. International House of Pancakes,* 513 F.2d 114, 124 (8th Cir. 1975), *cert. denied*, 423 U.S. 864, 46 L. Ed. 2d 93, 96 S. Ct. 124 (1975); and *Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974)). In this case, it is the likelihood of success on appeal, not at trial, that is at issue since it was not until after the prior appeal that the Settlement was even contemplated. It is Relators' appeal that was settled; Relators' rights to appeal that were abrogated. At argument before this Court in the attorney's fee

appeal, 15-10711, and in argument at the fairness hearing, Keiser's representatives stressed the purpose of the Settlement was to put an end to the appeals.

Relators' likelihood of success had the initial appeal proceeded is most easily judged by evaluating the strength of the arguments made in their Initial Brief in that appeal. That brief is part of the record here, R.432-3, and Relators submit the arguments it contained were substantial and had a high likelihood of success if heard by this Court. Among these arguments, a few in particular point out glaring errors by the trial court and highlight the vulnerability of the Trial Ruling to reversal on appeal.[15] They concern:

(1) the definition of false claims used;

(2) the court's consideration of the Government's failure to intervene and failure to pursue administrative remedies in determining damages;

(3) the standard the court used to avoid imputing knowledge to the university; and

(4) the district court's speculation concerning damage offsets and its failure to treble damages before giving Keiser credit for these offsets.

---

[15] Relators' Initial Brief set forth numerous additional errors of law and questionable findings of fact. R.432-3.

22

(1)    The definition of false claims.

The district court refused to consider each separate request for Title IV funds

as a false claim.  In so doing, the court ignored binding authority in this circuit,

specifically, *United States ex rel. McNutt v. Haleyville Medical Supplies, Inc.*, 423

F.3d 1256, 1259 (11th Cir. 2005) and *United States v. Killough*, 848 F.2d 1523,

1533 (11th Cir. 1988). In addition, a recent decision of this Court, *Urquilla-Diaz et*

*al. v. Kaplan Univ. et al.*, 780 F.3d 1039 (11th Cir. 2015), rendered after trial but

before the district court ruled on the adequacy of the Settlement, eliminated any

lingering doubts on the issue. *Urquilla-Diaz* (1) goes out of its way to explicitly

adopt the false certification doctrine, (ii) cites to *McNutt* with approval and (iii)

instructs that requests for funds related to FAFSAs are false claims. *Urquilla-Diaz*,

780 F.3d at 1055, fn 13.[16]

Without explanation, the district court below declared *Urquilla-Diaz*

irrelevant, R.435 at 3-4; other district courts within this Circuit have held

otherwise.

> The Eleventh Circuit recognizes both varieties of false
> certification: express false certification and implied false
> certification. See *Keeler,* 568 F. App'x at 798-99; *Urquilla-*

---

[16] The Supreme Court has recently granted cert. to resolve a conflict among the
circuits on the vitality and scope of the implied false certification doctrine.
*Universal Health Servs. v. United States ex rel. Escobar*, 2015 U.S. LEXIS 7677,
193 L. Ed. 2d 465, 84 U.S.L.W. 3320 (U.S. Dec. 4, 2015).

> *Diaz*, 780 F.3d at 1045 (expressly adopting the false certification theory of liability).

*United States ex rel. Phalp v. Lincare Holdings, Inc.*, 116 F. Supp.3d

1326, 1345 (S.D. Fla. 2015).

And:

> A false certification may also be implied "where compliance with a law, rule, or regulation is a prerequisite to payment but a claim is made when a participant has engaged in a knowing violation." *Keeler*, 568 F. App'x at 799.

*United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*,

2015 U.S. Dist. LEXIS 156924, *102-103 (N.D. Ga. Oct. 30, 2015).

Despite the explicit and implied false certifications of eligibility Keiser

submitted with each separate request for Title IV funds, R.350 at 547-552, the

district court refused to consider the tens of thousands of separate requests as false

claims either in its damage analysis or in its assessment of penalties (a/k/a

forfeitures). R.318 at 13-14. This failure effectively converted the FCA's forfeiture

provision into an annual license fee of $5,500 for Keiser to wrongfully obtain

hundreds of millions in federal funds.

The Supreme Court, albeit in the slightly different context of subcontractor

liability, has condemned such a result:

> To equate the number of **forfeitures** with the number of contracts would in a case such as this result almost always in but a single forfeiture, no matter how many fraudulent acts the subcontractor might have committed. This result would not only

24

be at odds with the statutory language; it would also defeat the
statutory purpose. Such a limitation would, in the language of the
Government's brief, convert "the Act's forfeiture provision into
little more than a $ [5],000 license for subcontractor fraud."

*United States v. Bornstein*, 423 U.S. 303, 311, 96 S. Ct. 523, 529 (1976).

The Trial Ruling simply ignored *Bornstein*, *McNutt*, *Killough* and

*United States ex rel. Keeler v. Eisai, Inc.*, Case. No. 13-109730 (11th Cir. June 11,

2014) and converted the FCA's penalty provision into a license for fraud.

### (2)    The Government's failure to intervene and
### failure to pursue administrative remedies.

It is well settled that, in an FCA case, no inference may be drawn from

Government inaction.  *United States ex rel. Atkins v. McInteer,* 470 F.3d 1350,

1360 n. 17 (11th Cir. 2006) ("We do not assume that in each instance in which the

government declines intervention in an FCA case, it does so because it considers

the evidence of wrong doing insufficient or the *qui tam* relator's allegations for

fraud to be without merit."); s*ee also, United States ex rel. Ubl v. IIF Data*

*Solutions*, 650 F.3d 445, 457 (4th Cir. 2011) ("the government's decision not to

intervene therefore is not relevant"); *United States ex rel. Feldman v. van Gorp*,

697 F.3d 78, 98 n. 9 (2d Cir. 2012); *United States ex rel. Chandler v. Cook County,*

*Ill.,* 277 F.3d 969, 974 n. 5 (7th Cir. 2002) ("The Justice Department may have

myriad reasons for permitting the private suit to go forward including limited

prosecutorial resources and confidence in the relator's attorney."), *aff'd*, 538 U.S. 119, 123 S. Ct. 1239 (2003).

If the negative inferences the district court drew here were permissible, then why did Congress create a statute that specifically contemplated private relators proceeding on their own? In fact, some would argue, one of the primary reasons Congress enacted the *qui tam* provisions was to augment the Government's resources and provide an outsider's view on the ways in which contractors might be defrauding the Government.  To cite the Government's decision not to intervene as a reason to exonerate the defendant or not to impose damages is contrary to the plain language of the FCA.

The district court's reliance on the lack of any administrative action by the Department of Education is similarly misplaced.  It smacks of the argument the FCA is preempted when there is a comprehensive set of administrative remedies, an argument rejected by the Eighth Circuit in *United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist.*, 688 F.3d 410, 415 (8th Cir. 2012) and by the Second Circuit in *United States v. General Dynamics Corp.*, 19 F.3d 770 (2d Cir. 1994). "Congress enacted the False Claims Act to allow the government a variety of remedies, both statutory and administrative, to combat fraud."  *Onnen,* 688 F.3d at 415.  That both DOE and DOJ chose to sit back and let Relators carry the flag

against Keiser is irrelevant as a matter of law as to whether Keiser should have to

repay the Government funds it obtained through its false statements and claims.

The wisdom of this jurisprudence is underscored by the path down which the

district court was led by ignoring it. To answer its own damage questions, the trial

court speculated about: (i) what options were available to the Government, (ii)

what the outcome of those options might have been, and (iii) what steps the

Government actually took.  R.318 at 18-19 ¶¶ 45-49.  This speculation conflicts

with a significant aspect of the 1986 Amendments to the FCA and Eleventh Circuit

precedent.

A primary purpose of the 1986 amendments was to encourage private *qui*

*tam* actions.

> The proposed legislation seeks . . . to encourage any
> individual knowing of Government fraud to bring that infor-
> mation forward. In the face of sophisticated and widespread
> fraud, the Committee believes only a coordinated effort of both
> the Government and the citizenry will decrease this wave of
> defrauding public funds. S. 1562 increases incentives, financial
> and otherwise, for private individuals to bring suits on behalf of
> the Government.

S. Rep. 99-345 at 2 (1986).

To achieve this goal, the amendments balance the Government's legitimate

interest in controlling FCA cases against the objective of encouraging private suits.

The balance struck acknowledges the Government's right to take control of the

litigation or to pursue the claim administratively; however, if the Government

chooses not to take any action, the relator is free to pursue the action unimpeded.

31 U.S.C. § 3730(c)(5).

The revised §§ 3730(c) and 3730(b) create three mutually exclusive options: (i) the Government can intervene and proceed with the action; (ii) the Government can intervene but elect to pursue administrative remedies, or (iii) the Government can take no action and the relator may proceed with the case.

> [T]he Government may elect to pursue the claim either judicially or through an administrative civil penalty proceeding. In the event that the Government chooses to proceed administratively, the *qui tam* relator retains all the same rights …. If the Government proceeds administratively, the district court shall stay the civil action pending the administrative proceeding and any petitions by the relator, in order to exercise his rights, will be to the district court. While the Government will have the opportunity to elect its remedy, it will not have an opportunity for dual recovery . . .. In other words, the Government must elect to pursue the false claims action either judicially or administra-tively and if the Government declines to intervene in a *qui tam* action, it is estopped from pursuing the same action administratively or in a separate judicial action.

S. Rep. 99-345 at 27 (1986).

Under such a schema, to speculate about the actions the non-intervening Government could have taken and what their outcomes might have been in order to determine damages seems counterintuitive and contrary to legislative intent. If the Government's failure to intervene estops it from pursuing administrative actions, how can its post-filing failure to seek administrative remedies be interpreted as anything more or less than a simple decision not to intervene? And how can a

28

court legitimately speculate about or a relator establish what would have occurred

if the Government did intervene and chose the administrative route?  The district

court's damages measure would require Relators to prove an impossible case

within a case.

Surely, if the Government initiates an FCA case, it need not establish what

other steps it might have taken and what results would have been obtained. *Onnen,*

*supra.* The district court's perspective would create different measures of damages

for the same violations, one if the Government prosecutes the case and one if a

relator prosecutes. This is not only undesirable but absurd.

(3)    <u>The standard the district court used in</u>
<u>refusing to impute knowledge to Keiser.</u>

In this Circuit, for purposes of liability under the FCA, "the knowledge of an

employee is imputed to the corporation when the employee acts for the benefit of

the corporation and within the scope of his employment." *Grand Union Co. v.*

*United States*, 696 F.2d 888, 891 (11th Cir. 1983) (citations omitted). In the instant

case, the actions of the Keiser employees who engaged in ICB violations clearly

met this standard. Every one of the perpetrators was a managerial employee acting

for the benefit of the company.  Most occupied high-level management positions

and included, *inter alia*, vice chancellors, campus presidents and admissions

directors. R.432-3 at 59-70.

29

The district court claimed to apply not *Grand Union* but the "collective knowledge doctrine." R.318 at 11 ¶ 26. The "collective knowledge doctrine" would impute the collective knowledge of all of Keiser's employees to the university.  R.317 at 5.  Despite adopting the doctrine, the district court did not actually apply it.  Instead, it found an absence of *scienter* based on its conclusion that Keiser's "top policymakers were not aware" of the illegal conduct before November 20, 2009. R.318 at 7 ¶ 13.

Not only is this finding demonstrably wrong, (*See* R.432-3 at 59-70), no other case holds knowledge will be imputed only when "*top* policymakers" are *actually* aware.  Certainly, that is not what *Grand Union* holds nor is it in harmony with the "collective knowledge" approach the district court claims it used.

> (4) The district court's speculation concerning possible damage offsets and its failure to treble damages before giving Keiser credit for these offsets.

Whether recoveries from third parties should be credited before or after trebling FCA damages has been resolved unequivocally by the Supreme Court. "[T]he Government's damages should be doubled before any compensatory payments are deducted, because that method of computation most faithfully conforms to the language and purpose of the Act.*"  United States v. Bornstein*, 423 U.S. 303 at 314, 96 S. Ct. 523 (1976).

Even before *Bornstein*, a district court held loan repayments by third parties should only be credited after the Government's outlay has been doubled. *United States v. Globe Remodeling Co.*, 196 F. Supp. 652, 657 (D. Vt. 1960). The *Bornstein* Court mentions *Globe Remodeling* in its opinion and appears to borrow much of the *Globe Remodeling* court's reasoning. *Compare Bornstein*, 423 U.S. at 315*, 96 S.Ct. at 530-531, *with Globe*, 196 F. Supp. at 657. Thus, the *Bornstein* Court's reasoning is directly applicable to student loans.

First, the *Bornstein* Court notes: "[t]he statute speaks of doubling 'damages' and not doubling 'net damages' or 'uncompensated damages.'" *Bornstein*, 423 U.S. at 314 n. 10, 96 S.Ct. at 530 n. 10.[17] The Court then explains the basis for its ruling in detail:

> First, this method of computation comports with the congressional judgment that double damages are necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims. Second, the rule that damages should be doubled prior to any deductions fixes the liability of the defrauder without reference to the adventitious actions of other persons. . .. Third, the reasoning of the Court of Appeals and the District Court would enable the subcontractor to avoid the Act's double-damages provision by tendering the amount of the undoubled damages at any time prior to judgment. This possibility would make the double-damages provision meaningless.

*Id.* at 315-16, 96 S.Ct. at 531.

---

[17] *Bornstein* was decided when FCA damages were doubled, not trebled.

These reasons are, *a fortiori*, applicable to the current case where: (i) "the adventitious actions of other persons," i.e. future student loan repayments, are yet to be determined and in doubt; and (ii) the *Bornstein* Court's concern the "possibility [of repayment] would make the double-damages provision meaningless" has actually come to pass.  In fact, the Court's fear has materialized in a manner even more striking than it foresaw.  The district court used the possibility of future payments by third parties to assess absolutely no damages against Keiser, let alone double or treble damages.  The district court ignored *Bornstein* and eviscerated the Act.

The district court also used the possibility of future loan repayments to erase losses from outright grants, losses it conceded were actually incurred. Going an unfathomable step further than simply discounting the losses associated with loans, it speculated the Government *might* make a profit on these as yet-to-be made loan repayments and this profit *might* counterbalance the unquestioned losses associated with Pell grants.  R.318 at 20-21 ¶¶ 53-54.  No such evidence was presented by either side nor was any legal authority cited in support of utilizing such a conjecture.

Indeed, the totality of the district court's various holdings concerning damages and forfeitures fly directly in the face of Congress' instruction that "the United States' damages should be liberally measured to effectuate the remedial

32

purposes of the [FCA], and that the United States should be afforded a full and complete recovery of all its damages." S. Rep. No. 96-615 at 4 (1980). Instead, the Trial Ruling invites educational institutions to pay the equivalent of a $5500 annual license fee and then ignore Title IV's requirements with impunity, a small price to pay for access to the unlimited revenues Title IV funding can provide.[18]

There are still additional reasons to conclude the likelihood of success on appeal is substantial. First, the U.S. supported Relators' positions on the issues of law raised by the appeal throughout the pre-appellate stages of the litigation. Second, the United States initially indicated it was likely to file an *amicus* brief supporting Relators' legal arguments. R.432-4. Third, the Government has been unable to cite cases supportive of the district court's conclusions of law despite Relators' repeated requests that it do so. R.432-9, 432-10, 432-13.

In summary, the likelihood of success on appeal is substantial and, though the burden lay with the Government and Keiser to justify the Settlement, neither they nor the district court even tried to counter Relators' contentions.

---

[18] Title IV programs are "entitlement" programs. Congress does not have to approve funding on an annual basis and the Government's outlay is not limited. It must disburse whatever the eligibility requirements dictate.

b)    The range of possible recovery

The gross inadequacy of the Settlement is particularly obvious in relation to the range of possible recovery. During the relevant years, Keiser received over $1.2 billion in Title IV funds, R.318 at ¶¶ 3-4, and submitted over 230,000 claims for federal funds. R.357-25.  Thus the upper range of recovery is $1.2 billion trebled plus 230,000 x $11,000 (the largest possible penalty per claim).  This amounts to $6.13 billion.  Though not a collectible sum, this is what strict application of the FCA would yield given the vast amount of money Keiser has fraudulently received at taxpayers' expense.

For argument's and practicality's sake, we will place arbitrary and severe constraints on this upper number, a step Relators were willing to actually take to address the Government's post-appeal concerns. R.432-13 at 3-5. If (i) Relators were to prevail on the number of false claims; but (ii) damages were limited to the out-and-out federal grants that do not have to be and never will be repaid,[19] and (iii) the minimum per claim penalty of $5,500 was assessed, Keiser's exposure for

---

[19] The district court found that "grants . . . do result in direct losses for the government," R.318 at p. 21, yet still failed to award any damages.

only one of the years is roughly $250,000,000.[20]  The Government settled for 1/10[th]

of one percent (0.001) of this amount.

        c)      The point on or below the range of possible
                recovery at which a settlement is fair, adequate and
                reasonable.

Given the strength of their appeal, Relators estimate their odds of success

approached, if not exceeded, 50%.  Add in a modifying factor for the inherent

advantage to the appellee and the further conservative bias prudent counsel should

always convey to their clients and Relators suggest 25% is a reasonable and highly

conservative estimate of the probabilities of success if the original appeal had gone

forward.[21]

We will not bother to apply this percentage to the true upper range of the

recovery, as it still generates an impractical and uncollectible number.  But even

applied to the arbitrarily limited potential recovery described above, a fair

---

[20] (30,000 claims x $5,500 minimum penalty) + ($30,000,000 in grants x 3) = $255,000,000.

[21] This Court has found a settlement in the range of 15-25% of the potential recovery adequate even when the odds of success were "very low." *Sterling v. Stewart*, 158 F.3d 1199, 1203 (11th Cir. 1998). In another case, the Southern District of Florida found "[a]pproximately ten percent (10%) of the most probable sum Plaintiffs anticipated recovering at trial, which is being paid by one defendant on aiding and abetting claims and who did not initiate the scheme, constitutes a very fair settlement." *Gevaerts v. TD Bank, N.A.*, 2015 U.S. Dist. LEXIS 150354 (S.D. Fla. Nov. 5, 2015**).**

settlement point for only one year's exposure is $62.5 million ($250,000,000 x

.25). The Government is sabotaging the appeal for $335,000. To view the $335,000

settlement in another light, it is 2/3 of one percent of a conservative estimate of the

amount of money the Keiser family generates for itself in just one year out of this

"non-profit" institution. Footnote 3, above. The Settlement's inadequacy is starkly

obvious and only gets more extreme if additional years and loans are factored into

the analysis.

d)    <u>The complexity, expense and duration of litigation.</u>

The "complexity, expense and duration" factor considers the undesirable

future – regardless of result – being avoided by settlement. *In re Domestic Air*

*Transp. Antitrust Litig.*, 148 F.R.D. 297, 325 (N.D. Ga. 1993) *Gevaerts v. TD*

*Bank, N.A.*, 2015 U.S. Dist. LEXIS 150354, 17-18 (S.D. Fla. Nov. 5, 2015)

("[R]ecovery by any means other than settlement would require additional years of

litigation in this Court and others, including appellate courts.").  Here, however,

the case was all but done.  Discovery had been completed, the trial conducted and

the initial appellate brief and appendix filed.  All that remained was the filing of

appellee's brief and a possible reply by appellants.  If anything, the Government's

intervention and settlement has lengthened and complicated the proceedings,

causing far more expenditure of the Government's time and effort than would have

been required if the original appeal had been allowed to run its course.

36

e)     <u>The substance and amount of opposition to the settlement.</u>

The substance of Relators' opposition is set forth herein. This substance has yet to be countered in any meaningful fashion either by Keiser, the U.S. or the court below. In terms of amount of opposition, the only ones in a position to oppose the Settlement, i.e. the Relators, are emphatically against it.

f)     <u>The stage of proceedings at which the settlement was achieved</u>.

Typically, the more advanced the stage, the more comfort a court can take sufficient discovery and analysis has been undertaken before entering the settlement.  But this "typical" situation and the comfort derived from it rests on the assumption the same counsel who engaged in this discovery and analysis are the ones recommending the settlement.  That is not the case here. To the contrary, Relators and their counsel conducted the discovery alone, tried the case alone and analyzed the issues in preparing the initial appellate brief alone. Their evaluation based on their intimate knowledge of the case leads them to view the Settlement as an unjustified capitulation by the Government.

The Government, on the other hand, did not attend any depositions and did not attend any portion of the trial. Its decision to settle was made without having read the trial transcript or Relators' initial appellate brief. R.432-13.  Nor did the

37

Government seek Relators' or their counsel's opinion before negotiating or entering into the Settlement. R.432-13.  Rather, it intentionally kept Relators in the dark. It is as if they settled a case in its infancy without the benefit of discovery or legal analysis.  The Government's submissions to date confirm this.  They contain no analysis of the evidence, the legal issues or of the likelihood the Trial Ruling would be sustained on appeal. R.430, 434, 438 and 443.

g)    <u>There is substantial reason to believe the<br>Settlement was not reached in good faith.</u>

The idea the Government would sabotage its own interests is uncomfortable to contemplate but, unfortunately, the prevalent influence of special interests precludes rejecting the possibility out-of-hand.  Besides the facial irrationality of the Government's actions here, additional factors raise this ugly specter. These factors are discussed in detail below in relation to the district court's decision to deny Relators discovery or a hearing worthy of the name.

In short, all of the factors weigh strongly against finding the Settlement fair, adequate or reasonable.

38

**B. The District Court's Approval of the Settlement Was Tainted by Its Trial Ruling.**

The district court's analysis of the Settlement literally begins and ends with finding the Settlement is "for a sum much larger than that awarded at trial." R.435 at 5. Also see R.463 and 465. There is no analysis of the "fair, adequate and reasonable" factors beyond the conclusory assertion "the proposed settlement passes muster." R.435 at 5. Such a conclusory statement is insufficient.

> In approving a settlement, the trial court must "undertake an analysis of the facts and the law relevant to the proposed compromise" and "support [its] conclusions by memorandum opinion or otherwise in the record." *Cotton*, 559 F.2d at 1330. "A mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law will not suffice." Id. (internal quotation marks omitted).

*United States v. Alabama*, 271 Fed. Appx. 896, 901-902 (11th Cir. 2008).

The Supreme Court decades earlier voiced a similar view.

> It is essential [] that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law. . .. Although we are told that the alternative to settlement was "extensive litigation at heavy expense" and "unnecessary delay," there is no evidence that this conclusion was based upon an educated estimate of the complexity, expense, and likely duration of the litigation.

> Litigation and delay are always the alternative to settlement, and whether that alternative is worth pursuing necessarily depends upon a reasoned judgment as to the probable outcome of litigation.

*Protective Committee for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 435, 88 S. Ct. 1157, 1168 (1968).

The facial inadequacy of the district court's boilerplate approval of the Settlement here is exacerbated by the conclusory nature of the Trial Ruling on which it relies.  Numerous crucial aspects of the Trial Ruling are unexplained and stand as little more than unsupported conclusions. *See, for example*, R.432-3 at 33 (particularly, fn. 21).  The key cases which should have instructed the district court's analysis - *McNutt*, *Killough* and *Bornstein* – are simply ignored.  Though *Grand Union* is cited, no explanation is given for not following it.

The same is true with respect to the calculation of damages. Though the Trial Ruling cites *Feldman* and *United States v. Science Applications Int'l Corp*., 626 F.3d 1257 (D.C. Cir. 2010) and states that "a fact finder, considering the relevant evidence, should calculate damages by first determining the amount the government paid because of a defendant's false claims and then subtracting the value the government nonetheless received from the defendant" R.318 at 16, it

40

never conducts the calculation.  Though the amount received by Keiser is set forth, the court never attempts to determine what if any value the Government received, let alone address *Feldman*'s holding that when Government funds benefit third-parties, the value the Government receives is zero.

Relators are not suggesting the district court could not consider its Trial Ruling when evaluating the proposed settlement; they are suggesting it needed to at least examine and evaluate the asserted errors in that ruling.  The simple fact Keiser was willing to pay thirty times the court's judgment to prevent an appeal from moving forward calls out for a meaningful evaluation of that appeal rather than blind reliance on the possibly flawed Trial Ruling being appealed. But unexamined reliance on the prior ruling is all that occurred.

**C. The District Court's Prior Decision On the Merits Was Incorrect.**

The reasons the Trial Ruling was incorrect are largely set forth above in evaluating the likelihood of Relators' success on appeal. A more detailed recitation appears in the Initial Brief in 14-13992. R.432-3. Errors asserted therein but not mentioned above include:

1.    <u>The Measure of Damages Used.</u>

The district court held: "In calculating damages, the Court should determine what the government's financial position would have been had Keiser's February 9, 2010, Electronic Certification and the March 5, 2010, Compliance Audit been accurate."  R.318 at 16-17.  It then opined it had to determine:

> (1) what actions would the government have taken vis-à-vis Keiser's Title IV Funding if Keiser had made those disclosures [of ICB violations] in February/March 2010; (2) what would the government's financial position be if it had taken those actions; and (3) how does that financial position compare to the government's current financial position?

R.318 at 17, ¶ 42.  Further, the district court placed the burden of these proofs on the Relators. R.318 at 20, ¶ 50.

This measure is based on the court's more fundamental errors in not considering each separate request for funds a false claim - the court did not consider the damages caused by these thousands of requests – and in considering government actions relevant at all. (See discussion above.)

The court's measure of damages also effectively reinserts the strict "materiality" test Congress rejected in the 2009 amendments to the Act. In accord with these amendments, this Circuit utilizes the "natural tendency" materiality test, *see United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1228 (11th Cir. 2012), and, as the district court acknowledged, this standard was easily met here. But the trial court's measure of damages requires precisely the

proofs Congress rejected in defining "materiality."  By considering "what actions would the government have taken vis-à-vis Keiser's Title IV Funding if Keiser had made those disclosures [of ICB violations] in February/March 2010," R.318 at 17 ¶ 42, the court, in the guise of measuring damages, reinserted an element of proof Congress explicitly eliminated.

       2.     The Burden of Proof Regarding Offsets.

Though the FCA does not state who bears the burden of establishing offsets against damages, the general remedial purpose of the statute and the reasoning in cases such as *Bornstein* strongly suggest the burden should lie with the violator. *Bornstein* refers to payments by third parties as "mitigation of . . . damages." *Bornstein*, 423 U.S. at 316.  Subsequent case law has uniformly held the Government does not even have a duty to mitigate. *See, for example FDIC v. Oldenberg*, 38 F.3d 1119, 1121 (10th Cir. 1994) and *United States v. Aging Care Home Health, Inc.*, 2006 U.S. Dist. LEXIS 73047 at *3 (W.D. La. 2006). To suggest relators or the U.S. bear the burden of proving the absence of offsets is directly at odds with the statutory language and intent. The same result would be reached if one chose to consider loan repayments as recovery from a "collateral source" in a case sounding in tort.

3.    Numerous Aspects of the District Court's Findings Are Not Supported by The Record.

   a)    The district court's finding that Keiser only submitted two claims.

Should ¶ 34 of the Trial Ruling be read as a finding of fact that Keiser played no role in submitting the individual claims for Title IV funds, there is absolutely no support for it in the record.  Peter Crocitto, Keiser's COO, testified without contradiction that Keiser: (i) determines the amount of aid a student is entitled to, (ii) submits that calculation to the DOE, (iii) certifies each student's eligibility (and, hence, Keiser's) under Title IV, (iv) makes the ultimate request for funds to DOE and (v) is the direct recipient of the funds. R.350 at 547-552.  Federal regulations and the FAFSA form confirm this testimony. 34 C.F.R. § 668.162 and R.357-23 (P-73) at 10.

   b)    The finding Keiser's "top policymakers" lacked knowledge of the violations prior to November 2009.

Clearly erroneous findings of fact pepper the Trial Ruling and appear to contribute to the ultimate, mistaken conclusory finding on *scienter*.

(1)    The exclusive focus on gift cards and token
days.

The district court's *scienter* analysis focuses exclusively on gift cards and "token days." But even if one accepts that these practices were brought to the attention of Dr. Keiser and Mr. Crocitto for the first time in November 2009 – a contention Relators submit is not supported by the record – they and other "top policymakers" were surely aware of and condoned other ICB-violating practices since as early as 2003. The district court ruled such practices, including cruises, meals given to individuals and to "winning" admission teams, and social outings, violated the ICB, R.318 at 6, ¶¶ 10-11, 7 n. 4. But it completely ignored who was aware of these other practices and when in finding an absence of *scienter*.

One stark example is the awarding of cruises. This practice was engaged in from 2003 through 2008 for all campuses, R.350 at 497; it was organized by Brian Woods, Vice Chancellor of Enrollment and a member of Dr. Keiser's "cabinet," R.350 at 487, 495; and Mr. Crocitto, too, was contemporaneously aware of the practice.[22] R.356-17 (P-26), R.356-19 (P-28), R.358-42 (P-122); R.360-4(D-4); R.360-5 (D-5); R.360-6 (D-6); R.360-7 (D-7).

---

[22] The record contains a post-trial chart identifying all of the documents that established knowledge and extent of the practices. R.316. The chart provides a road map to the various aspects of the record that overwhelmingly established the widespread nature of the practices and the knowledge of top management.

Another example is the practice of offering free meals to individuals and groups for winning enrollment "contests" or meeting specific enrollment targets. Vice Chancellor Hochanadel was aware of the practice, R.544 at 350, R.356-9 (P-18), R.358-34 (P-114), R.358-35 (P-115), R.358-36 (P-116), as was Mr. Crocitto, R.356-18 (P-27), R.356-28 (P-37), R.357-19 (P-69), R.358-44 (P-124), and numerous other high-level managerial employees. The practice is set forth in board-approved master plans, R.356-1 (P-10) at 7, in a memo recommending the practice to each campus opening a graduate division, R.346-35 (P-44), R.356-36 (P-45), R.358-6 (P-86), R.359-5 (P-135), R.359-6 (P-136), and in a university-wide memo from the head of high-school enrollment.  R.356-23 (P-32), R.358-22 (P-102).

(2)   The finding the practices were limited to
two campuses.

The district court found the ICB violations were limited to two campuses, R.318 at 6 ¶12, but the uncontradicted record establishes virtually all campuses were engaged in some form of incentive compensation for enrollments.[23]

---

[23] R.356-6 (P-15), R.356-9 (P-18), R.356-14 (P-23), R.356-21 (P-30), R.357-6 (P-56), R.356-1 (P-10) at 7, R.356-4 (P-13), R.356-9 (P-18), R.356-17 (P-26), R.358-36 (P-116), R.374-20 (D-310) at 7, R.356-26 (P-35), R.356-29 (P-38), R.356-32 (P-41), R.357-16 (P-66),  R.359-2 (P-132), R.356-23 (P-32), R.358-22 (P-102), R.316 at 9, R.346-35 (P-44), R.356-36 (P-45), R.358-6 (P-86), R.359-5 (P-135), R.359-6 (P-136), R.349 at 418-19; R.349 at 446-450.

 (3) <u>The finding the practices violated Keiser policy.</u>

 The district court found that, despite the widespread prevalence of these practices, they were in violation of Keiser's official policies.  R.318 at 6 ¶ 12.  The only support for this finding is Keiser officials' self-serving statements that these practices were not in accord with their understanding of Keiser's "culture."[24] When asked to explain the source of this understanding, the witnesses were vague and uncertain; however, the uncontradicted record reveals this 14 campus, 20,000 student institution never created any written statements memorializing these alleged policies,[25] provides no training concerning the ICB's limitations to any of its supervisors of admissions counselors,[26] and, prior to this litigation, virtually no one directly involved in supervising admissions counselors, including Mr. Woods, even knew what the ICB was.[27] After entering into a settlement with the Florida Attorney General's office promising to cease ICB violations, Keiser did not bother

---

[24]  R.348 at 69, 92, 104, 106, 138-141, 164-65, 195; R.349 at 325; R.350 at 511; R.350 at 571-72, 577-78, 610.

[25]  R.349 at 403-06; R.348 at 258-61; R.348 at 65-66, 101-02, 104; R.349 at 366-67; R.349 at 435; R.350 at 515.

[26]  R.350 at 488-89, R.349 at 399.

[27]  R.348 at 262-63, R.349 at 353-55, R.349 at 399, 430, R.349 at 450, R.350 at 488-89.

to inform admissions personnel of the relevant terms of the settlement.  R.349 at 421.

The "culture" statements, moreover, were – like the district court's analysis of *scienter* – limited to giving out gift cards and token days.  No one claimed that the cruises or the meals were against Keiser's culture or policy.  In fact, the testimony revealed meal incentives continue to be given to admissions teams to this day. R.348 at 112-17, 228, 232; R.350 at 617-20.

Even regarding token days and gift cards, the record proves long-term members of Keiser's high-level management team such as Vice Chancellor Hochanadel, Regional Director of Operations Jay Lambeth, and Vice Chancellor Fuller, individuals intimately familiar with the institution's policies and culture, either were aware of, initiated or participated in the practices. R.316 at 9-10. A culture is best judged by how people act, not by what they say.  R.350 at 609-10.

(4)    The November 2009 investigation and the
finding Keiser stopped the violations.

The district court found Keiser stopped the gift card and token day practices after discovering them during a November 2009 investigation.[28]  R.318 at 7 ¶15. However, there is no documentary evidence to support this assertion.  No emails

---

[28] The district court goes so far as to "commend" Keiser for his actions.  R.318 at 7 ¶15.

48

were sent, no written directives issued, no policies published.[29] The only supportive evidence is Dr. Keiser's self-serving testimony.  But viewed in conjunction with the testimony of others, one can only conclude what occurred was not an investigation, but a cover-up.

The contradictions, inconsistencies and voids in the testimony are numerous:

- Dr. Keiser testified he asked W. Searle to investigate the token day practice. Searle denies it and did not conduct an investigation. *Compare* R.348 at 89-90, 93*, with* R.349 at 364, 367.  No one did. R.349 at 364, 367, 373; R.348 at 258-61; R.350 at 488-89; R.350 at 569-72.

- Dr. Keiser's primary concern was not the ICB but the breakdown in the timekeeping system.  R.348 at 89-91, 191.

- Dr. Keiser "thought" he talked to Sherry Olsen, R.348 at 91, the campus president who ran the token day system. R.348 at 263. He never did.  R.349 at 337-38, 341.  No one bothered to interview her. R.348 at 258-61, R.349 at 316-319.

- No one interviewed Rhonda Fuller, who distributed gift cards as incentives for years.  R.349 at 405-06.

---

[29] R.348 at 138-41, 165-68; R.348 at 258-6; R.359 at 357; R.349 at 401-06; R.433-35; R.350 at 514-16; R.350 at 569-72, 617-20.

- Dr. Keiser testified the only thing he did to stop the practices was telling Mr. Crocitto to stop them. R.348 at 165-68. Mr. Crocitto doesn't recall being given any such directive.  R.350 at 569-72.

- Mr. Woods, to whom Directors of Admissions reported, was not informed of the investigation.  R.350 at 448-489.

- No one sought to determine whether the violations needed to be reported.  R.350 at 520-21; R.350 at 572.

- No one recalls anything specific that was done to stop the practices. R.348 at 258-261; R.349 at 353-55, 357, 364, 366-67, 374-77; R.349 at 400-06, 417-420; R.349 at 433-38, 442-43, 447-49; R.350 at 488-89, 515, 519; R.350 at 569-572, 617-19.

- No effort was made to determine the extent of the practices, R.348 at 136-37; R.348 at 258-61; R.349 at 405-06; R.349 at 433-35; R.350 at 518-19; or to institute any record keeping system that would permit future verification of compliance.  R.349 at 405-06; R.350 at 569-72, 579, 615-18.

- Compliance auditors were not informed, R.348 at 316-19; R.349 at 433-435, 450; R.350 at 494-96; they did not review any records that would reveal ICB violations, R.348 at 208-211; and managers were instructed not to use the word "enrollment" in written

50

communications, R.349 at 379-81, 385, 390; R.356-40 (P-49), R.356-41 (P-50); R.357-19 (P-69); R.357-22 (P-72), R.357-26 (P-76).

In sum, the evidence reflects a cover-up, not an investigation.

(5)    <u>The finding there was no deliberate<br>ignorance or reckless disregard for the truth.</u>

In a footnote, the court held there was "no evidence of deliberate ignorance or a reckless disregard for the truth." R.318 at 11 ¶ 5. In fact, the evidence of deliberate ignorance or actual knowledge, is overwhelming.

- No records were kept that would permit an auditor to determine who received incentive rewards or why. R.348 at 259-60; R.349 at 405-06.

- No admissions personnel were consulted before Keiser made its representations of compliance with the ICB or before Keiser executed the PPAs. R.348 at 316-19; R.349 at 405-06; R.349 at 450; R.350 at 494-96.

- There was no ICB compliance program.[30]

---

[30] The compliance audits touted by Keiser and relied on by the district court only covered financial aid and other records-based matters. R.348 at 208-211; R.349 at 316-19.

51

- Supervisors of admissions personnel were not informed of the
  limitations imposed by the ICB.   R.348 at 262-63; R.349 at 399;
  R.349 at 433-35; R.350 at 488-89.

- There is no evidence of any prophylactic effort to determine the
  legality of the practices.

c)     <u>The calculation of damages was clearly erroneous.</u>

Though the district court's primary errors concerning damages lay in the

legal standards it applied, the court also made a number of clearly erroneous

factual findings.

First, the court found the potential profits from future loan repayments might

outstrip losses associated with Pell grants.  We use the term "found" loosely; the

court's finding is hedged with a number of "mights."  Thus the finding's major

defect is that it is pure speculation.  The supposed fact basis for the speculation is

(i) a newspaper article, *i.e.*, hearsay, which actually says there will be a net loss,

R.351 at 848-851, and (ii) calculations for governmental budgetary purposes, again

hearsay, and a notoriously politically driven exercise.  R.350 at 640-44.  In fact, the

governmental calculation the court relied on is so unreliable that the Congressional

Budget Office has taken the unprecedented step of preparing an alternative, reality-

based calculation that does not support the court's speculation. *Id.* In any event,

52

there was no testimony quantifying these purported profits or measuring them against the incurred losses.

Finally, the district court discounted the testimony of Relator's expert for the sole reason that he was not a CPA and had not testified about damages before. R.318 at 20-21 n. 10. But his testimony concerned data on student loan defaults, a subject about which he was uniquely qualified and which required no accounting expertise. The court itself recognized this in its prior *Daubert* ruling. R.255 at 4-6.

"The entire evidence" combined with the erroneous legal standards applied, leaves one "with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542 (1948).

## D. The Government's Intervention Was Not for Good Cause nor Did It Satisfy Fed. R. Civ. P. 24.

### 1.    Applicable Legal Context and Standards

Though the Government may intervene in an FCA case as of right during an initial 60-day period, subsequent intervention requires good cause. 31 U.S.C. § 3730(c)(3) ("When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause.").

Relatively little case law interprets this "good cause" requirement, but cases that

speak to the issue hold that the good cause requirement exists to protect the

interests of the relator.

> [C]ourts have found good cause in cases where the government
> realized the magnitude of the alleged fraud was much larger
> than it had originally anticipated; where the government
> received additional and new evidence about the case; and where
> intervention would protect the interests of the relators. . ..;

*United States v. Aseracare, Inc.*, 2012 U.S. Dist. LEXIS 152591, 7-8 (N.D. Ala.

Oct. 24, 2012) (citing *U.S. ex rel. Stone v. Rockwell Intern. Corp.*, 950 F. Supp.

1046, 1049 (D. Colo. 1996)).  *See also, United States ex rel. Baklid-Kunz v.*

*Halifax Hosp. Med. Ctr.*, 2011 U.S. Dist. LEXIS 109859, 3-5 (M.D. Fla. Sept. 27,

2011).

The relators' interests that need protection are significant.

> The recovery of a qui tam relator is intended to remedy the
> harm he suffered in several ways: by distancing the relator from
> the fraud and rewarding him for his involvement in the
> government's fight against unlawful activity; by compensating
> the relator for any harm he suffered with respect to his
> employment; and by compensating the relator for the
> substantial time and expense involved in bringing a qui tam
> action. . .. [T]he FCA's qui tam provisions are intended to
> remedy, at least in material part, the harm suffered by the
> individual relator . . .rather than the public at large.

*United States v. NEC Corp.*, 11 F.3d 136, 138-139 (11th Cir.1993).

The intervention must also meet the requirements of Fed. R. Civ. P. 24.

*United States ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 689 (W.D.

Tex. 2007). Under the rule, the timeliness of the intervention is a threshold issue.

*United States v. Ritchie Special Credit Invs., Ltd.*, 620 F.3d 824, 832 (8th Cir.

2010).

> Four factors determine timeliness:
>
> > (1) "the length of time during which the would-be intervenor
> > actually knew . . . of his interest in the case before he petitioned
> > for leave to intervene"; (2) "the extent of the prejudice that the
> > existing parties to the litigation may suffer as a result of the
> > would-be intervenor's failure to apply for intervention as soon
> > as he actually knew . . . of his interest in the case"; (3) "the
> > extent of the prejudice that the would-be intervenor may suffer
> > if his petition for leave to intervene is denied"; and (4) "the
> > existence of unusual circumstances militating either for or
> > against a determination that the application is timely."
> > *Stallworth v. Monsanto Co*., 558 F.2d 257, 264-66 (5th Cir.
> > 1977).

*Brown v. Advantage Eng'g, Inc.*, 960 F.2d 1013, 1015 (11th Cir. 1992).

Finally, the court "must consider whether the intervention will unduly delay

or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P.

24(b)(3).

> 2.    <u>The Motion to Intervene Was Not Timely.</u>

> > The issue of timeliness inevitably arises if a motion to intervene
> > is made following a judgment. Intervention at this point is
> > generally disfavored, as it should be, . . ."The more advanced
> > the litigation, the more searching the scrutiny which the motion
> > [to intervene] must withstand."

6-24 <u>Moore's Federal Practice</u> - Civil § 24.21.

The Government's motion post-dated appeal; it should have been subject to the highest degree of scrutiny. Instead, its timeliness was not scrutinized at all. Had it been, the *Stallworth* factors all militated against a finding of timeliness.

First, it is indisputable the Government "actually knew . . . of [its] interest in the case" from the moment it was filed; even before Keiser was aware of the litigation.  It was provided with a copy of the complaint while still under seal.  It waited over three years before moving to intervene.

The second factor, "the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew . . . of his interest in the case," also weighs against excusing the delay.  For three years, the Government let the burden of pursuing this case rest upon Relators.  This burden was not insignificant; prior to the appeal, over $28,000 in billable costs, R.353, nearly 3,000 hours of attorney time and over $75,000 in expenses incurred. R.326 and R.340. The first appeal added still additional time and expense. None of these expenses and fees would have been incurred if the Government had intervened earlier.

The Government, on the contrary, would have suffered no prejudice if its motion was denied.  It would be better off had the first appeal been successful.  And, even if unsuccessful, the difference in the recovery would be *de minimus* relative to the amount at issue and relative to the funds expended by the U.S. under

Title IV. Moreover, if the appeal were not successful, it would mean the U.S. would receive no more than it was entitled to.

The final factor, whether there are any unusual circumstances, also militates against late intervention. The effect and intent of the intervention is to deny the Relators their right to appeal.  To permit the Government to pull the rug out from under Relators after they pursued the litigation to the point of filing an appellate brief and appendix is inequitable and unjust.  The *Stallworth* factors simply do not permit a finding of timeliness at the extraordinarily late stage in the litigation when the Government moved to intervene.

3.    The Intervention Has Unduly Delayed and May Prejudice the Adjudication of the Original Parties' Rights.

The intervention has already unduly delayed the adjudication of the Relators' rights and, if not reversed by this Court, it will have denied Relators' their right of appeal. It is hard to imagine a more extreme prejudice.

4.    The Government Has Not Demonstrated Good Cause.

The only cause the U.S. has articulated for its post-appeal intervention is its desire to settle.  There is no new evidence or changed circumstances; nor is the U.S. seeking to protect the Relators' interests. To the contrary, the sole reason for

the intervention was a settlement the Relators opposed and which benefited no one but the defendant.

The two cases cited below by the Government in support of its assertion that a desire to settle alone constitutes good cause for late intervention are either inapposite or actually support a contrary result. In the first, *United States ex rel. Lam,* the proposed intervention <u>did not</u> seek to effectuate a settlement of relators' case. Rather, the Government had already entered into a global settlement with the defendant that it claimed was unrelated to the *Lam* relators' disclosures. <u>It sought to intervene to dismiss relators' case</u> based on the public disclosure defense. *United States ex rel. Man Tai Lam v. Man Tai Lam*, 287 Fed. Appx. 396, 399 (5th Cir. Tex. 2008).

The second, *United States ex rel. Reynolds v. General Electric Co.*, Case No. 6:03-cv-03372, 2007 WL 3020464, at *3 (D.S.C. Oct. 11, 2007), actually supports Relators' opposition to intervention.  In *Reynolds*, it was the relators who entered into the settlement, not the Government.  The Government attempted to intervene to end-run the relators and negotiate a different settlement but the district court would have none of it, stating:

> This Court refuses to allow the government to intervene
> because the undersigned will not condone the government's
> unauthorized, impertinent conduct for three reasons. First, it is
> clear that the government has failed to show good cause to
> intervene: Acquiring a larger settlement, faster than the relators,
> is not "new evidence" that increases the magnitude or quality of

58

the fraud perpetrated. At a minimum, this Court is compelled to admonish the government for its audacity to pursue a settlement behind the back of the relators, thereby, prolonging litigation.

* * *

Second, this Court will not allow the government to intervene because it would limit the status and rights of the relators. 31 U.S.C. § 3730(c)(3) . . .. This Court will not allow the government to limit the relators' status within the settlement negotiations or the relators' rights to the benefits of their diligent efforts.

Third, allowing the government to intervene would defeat the very purpose of the qui tam provision of the FCA. . .. If the government, after voluntarily choosing not to intervene in the suit, could enter into a settlement agreement with a defendant at any point, "It would deter [relators] from pursuing such actions in the future." Id. This Court will not allow the government to discourage future qui tam litigation and defeat the purpose of the FCA's qui tam provisions because the government stands to make a bit more money in the immediate case.

*Reynolds*, U.S.D.S.C, 6:03-cv-03372-GRA, Doc. # 128, pp. 7-11(Emphasis added) (full opinion at R.432-1). It was only after the Government backed off of this effort and decided to support the relators' settlement that the district court allowed it to intervene.

The transparent inapplicability of the Government's cited authority serves to underscore the unprecedented nature of its actions here.  They are unprecedented because they are "the very type of deplorable tactics" "[t]he 'good cause' requirement . . . [should] provide[] . . . the relators' interests protection from." *Reynolds*, Doc. # 128 at 9.

**E. Relators Were Entitled to Discovery and an Evidentiary Hearing.**

The hearing envisioned by § 3730(c)(2)(B) should not be a *pro forma* rubber

stamp. It may even be evidentiary in nature with relators entitled to discovery

before it is held.

> The Act's legislative history indicates that <u>it was Congress'</u>
> <u>intent that qui tam plaintiffs play an active role in settlement</u>
> <u>hearings.</u> The Senate Judiciary Committee, in its report on the
> legislation, stated as follows:
>
> > Subsection (c)(1) provides qui tam plaintiffs with a
> > more direct role . . . in acting as a check that the
> > Government does not neglect evidence, cause unduly
> > [sic] delay, or drop the false claims case without
> > legitimate reason . . ..
>
> S. Rep. No. 345, 99th Cong., 2d Sess., reprinted in 1986 U.S.
> Code Cong. & Admin. News at 5290-91. Representative
> Howard Berman, in a report concerning the legislative history .
> . ., stated:
>
> > The person initiating the action is given an opportunity
> > to object to the settlement, including the development
> > and presentation of evidence at a hearing, before the
> > court makes its final determination as to fairness.132
> > Cong. Rec. 29,322 (1986).

*United States ex rel. McCoy v. California Medical Review, Inc.*, 133

F.R.D. 143, 148-149 (N.D. Cal. 1990).

60

This did not occur here.  The district court decided the issue in its indicative ruling without the benefit of any hearing.[31] After remand the court refused to allow discovery or the presentation of evidence.  The hearing was a mere formality.  During oral argument – which is all the hearing was - the court asked few questions and made no inquiries concerning the reasons for the settlement. When oral argument ended it issued an unexplained decision from the bench instantaneously.  There was no deliberation.

This history alone should invalidate the court's ruling but numerous other factors also bring the court's handling of the motion into question.

Judging the fairness of a settlement is not limited to evaluating its substantive terms.  The process also must be examined. "[T]he district court must find that [the settlement] "is fair, adequate and reasonable <u>and</u> is not the product of collusion between the parties." *Bennett,* 737 F.2d at 986 (emphasis added).  Relevant factors include whether the settlement was (i) the result of arm's length negotiations; (ii) collusive or based upon improper considerations; and (iii) the result of proper investigation by the U.S.  *See Bennett*, 737 F.2d at 986; *U.S. ex rel. Schweizer*, 956 F. Supp. 2d at 11; *U.S. ex rel. Resnick*, 2009 WL 637137, at \*2.

---

[31] Relators asserted in their opposition to the indicative ruling that a hearing was necessary before the court could indicate whether it would approve the Settlement. R.432 at 6.  This contention was ignored. R.435.

Facts and allegations that suggest "collusion between the government and the defendant" give rise to a right to discovery.  *U.S. ex rel. Schweizer v. Océ N. Am., Inc.*, 956 F. Supp. 2d 1, 11 (D.D.C. 2013); *see also U.S. ex rel. Nudelman v. International Rehab. Assocs., Inc.*, 2004 U.S. Dist. LEXIS 8951, 2004 WL 1091032, at *1 (E.D. Pa. May 14, 2004).  Even under the lesser degree of scrutiny applied to Government dismissal of an FCA case, relators may successfully oppose by establishing the dismissal "is fraudulent, arbitrary and capricious, or illegal." *U.S. ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998).  A relator is entitled to an evidentiary hearing "if the relator presents a <u>colorable claim</u> that the settlement or dismissal is unreasonable in light of existing evidence, that the Government has not fully investigated the allegations, or that the Government's decision was based on arbitrary and improper considerations." *Ridenour v. Keiser-Hill Co., LLC,* 397 F.3d 925, 935 (10th Cir. 2005) (citation omitted, emphasis added.).

The analysis (in various sections above) of why the Settlement was not "fair, adequate and reasonable" certainly sets forth a colorable claim that "the settlement . . . [was] unreasonable in light of existing evidence." As for the adequacy of the Government's investigation, the Government originally claimed it needed to see all of the appellate briefs before even being able to decide whether to file an *amicus* brief, R.432-6, but it entered into the Settlement before Keiser filed any appellate

brief.  More troubling, the individual responsible for the decision to settle had not even read Relators' appellate brief, let alone the trial transcript before negotiating the Settlement. R.432-13. This surely supports a colorable claim of failure to investigate.

Finally and disturbingly, there is substantial reason to suspect "the Government's decision was based on arbitrary and improper considerations," if not out-and-out collusion. The facts and circumstances giving rise to these suspicions include:

1.     Relators were kept in the dark as to the fact negotiations were taking place, the manner in which they were conducted, who instigated and participated in them and how the settlement figure was arrived at. When the Government advised Relators that it feared this Circuit would issue a "result" oriented decision solely because of the amount of damages the statute called for, Relators offered to waive claims and significantly lower the amount of damages sought. No Government response was forthcoming. R.432-13. Though the Government promised Relators a "dialogue" after a meeting, the Relators never heard from the Government again until a month later when, without explanation, it reiterated its decision to settle. Why would the Government mislead the Relators and oppose targeted discovery concerning these events if all was on the up-and-up?

2.     The Government's rationale for the Settlement recited in its motions

for intervention and settlement are conclusory and bear little resemblance to

reasons articulated to the Relators before the motions were filed. R.432-13. This

discrepancy suggests the reasons given were pretextual.

3.     The facial insufficiency of the reasons bespeaks pretext as well.[32] The

first reason the Government offered - that the Settlement will "maximize recovery

to the U.S. in light of the uncertainty as to how the appellate court will rule in this

matter" - would be true of any settlement. R.430-10. It is an empty truism, *see*

*TMT Trailer Ferry,* 390 U.S. at 434, 88 S. Ct. at 1168, and nothing more than a

statement that the U.S. wanted to settle because it wanted to settle.  If this rationale

is sufficient, § 3730(c)(2)(B) is made meaningless.

The second reason offered below, conservation of resources, is transparently

disingenuous.  Not only had there been no mention of this rationale before the

filing, it was obvious to all the U.S. would expend far more resources pursuing and

defending the Settlement than it would spend watching Relators appeal.  The

assertion does not pass the straight-face test.

---

[32] Perhaps in awareness of their inadequacy, the U.S. did not even attempt to satisfy the "fair, adequate and reasonable" standard, insisting it did not apply.

To quote the Supreme Court once again:

> Litigation and delay are always the alternative to settlement,
> and whether that alternative is worth pursuing necessarily
> depends upon a reasoned judgment as to the probable
> outcome of litigation.

*TMT Trailer Ferry*, 390 U.S. at 434, 88 S. Ct. 1157 at 1168.

The Government has offered only truisms which, by their very tautological

nature, are pretextual. And, if the stated reasons were pretextual, it supports a

colorable claim the actual reasons were arbitrary or improper.

4.    The U.S.'s position here is glaringly inconsistent with its positions in

*United States v. Sanford-Brown, Ltd.*, 788 F.3d 696 (7th Cir. 2015), a highly

similar case.  Much like the instant case, *Sanford-Brown* is a *qui tam* action

brought against a for-profit educational institution alleged to have violated the

ICB.  As here, the U.S. declined to intervene.  The *Sanford-Brown* district court

granted the defendant's summary judgment motion, in part because the court

declined to adopt the implied false certification doctrine.  *United States v. Sanford-

Brown, Ltd.*, 30 F. Supp. 3d 806, 811-12 (E.D. Wis. 2014).  As here, the relator

appealed, arguing the implied false certification theory should apply.  Yet despite

these similarities, the U.S. filed two *amicus* briefs with the Seventh Circuit in

support of the *Sanford-Brown* relator, demonstrating the Government's willingness

to go to bat (i) in support of the implied false certification theory, *Sanford-Brown,*

*Ltd.*, Case: 14-2506, Documents 22 and 61 and (ii) in opposition to the finding that "the availability of administrative remedies for regulatory violations preclude FCA claims in the same context," both issues foursquare with Relators' position in this case. Id. at 13-14. But in this case, in contradistinction, the Government has turned tail.

The inconsistency is heightened by the fact that in crucial and possibly dispositive respects Relators' case here is far stronger than *Sanford-Brown*. In *Sanford-Brown*, relator introduced no evidence concerning the FAFSA submissions nor any evidence of *post-hoc* certifications of compliance. He relied solely on the prospective promises contained in the PPAs. *Sanford-Brown, Ltd.*, 30 F. Supp. 3d at 811. Here, on the contrary, Relators placed in evidence annual *post-hoc* certifications of compliance, detailed testimony describing Keiser's role in the FAFSA submission process and testimony describing the certifications of eligibility Keiser made when submitting each FAFSA request for funds. R.350 at 547-552.

The inconsistency between the U.S.'s stance in *Sanford-Brown* and its actions here cannot be explained without raising the specter of improper purpose or collusion. It certainly justifies discovery into the process that led the U.S. to pursue legal propositions in one court while preventing the Relators from advancing the identical propositions in another.

66

## VII.   CONCLUSION

For the above reasons, Relators respectfully request this Court:

1.      Vacate the district court orders dismissing the case, approving the Settlement, and permitting the U.S. to intervene;

2.      Reverse the district court's Trial Ruling and mandate entry of a new judgment as requested in the prior appeal on the merits (Appeal # 14-13992);

3.      Mandate that Relators be awarded 30% of the judgment; and

4.      Remand for renewed consideration of the appropriate amount of counsel fees and expenses to be paid by Keiser.

Respectfully submitted,

IRA B. SILVERSTEIN, ESQ.
THE SILVERSTEIN FIRM, LLC
1515 Market Street, Suite 1200
Philadelphia, Pennsylvania 19102
(215) 854-4068

DALE JAMES MORGADO, ESQ.
MORGADO PA
600 Third Avenue, 2nd Floor
New York, New York 10016
(212) 991-8431

DAVID A. KOENIGSBERG, ESQ.
MENZ BONNER KOMAR
    & KOENIGSBERG LLP
444 Madison Avenue, 39th Floor
New York, New York 10022
(212) 223-2100

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with Federal Rule of Appellate

Procedure 28-1(e)(2) and 32(a)(7)(C).  It is submitted in 14-point Times New

Roman font, and contains 13,883 words.

 /s/ Ira B. Silverstein

Ira B. Silverstein

## CERTIFICATE OF SERVICE

I hereby certify that on February 29, 2016, I filed this brief with the Court using the Clerk's CM/ECF filing system, which will serve an electronic copy to all parties of record, including counsel for the Appellees.

I also certify that on February 29, 2016, I sent via United States First Class Mail seven paper copies of this brief to the Eleventh Circuit pursuant to 11th Cir. R. 31-3.

  /s/ Ira B. Silverstein      

Ira B. Silverstein
